# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 CR 274 | **DATE** | 12/31/02 |
| **CASE TITLE** | | USA vs. Juan Mares-Martinez | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated on the attached Memorandum Opinion and Order, defendant Juan Mares-Martinez's motion to suppress evidence (112-1) is denied except with respect to the claim of material misrepresentations and/or omissions in the CA 99-5 and Chicago DEA wiretap applications. His request for a hearing on that aspect of the motion (112-4) are granted. Mares-Martinez's renewed motion for discovery (112-1) is denied. Defendant Trinidad's motion to adopt (127-1) is denied. Defendant Hugo Mares-Martinez's motion to adopt (121-) is granted to the extend set forth in order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | |
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | JAN 06 2003 | | |
| ✓ | Docketing to mail notices. | | date docketed | | 137 |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| OR | courtroom deputy's initials | | | date mailed notice | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | Case No. 00 CR 274 |
| | ) | |
| JUAN MARES-MARTINEZ, et al. | ) | |

DOCKETED

JAN 0 6 2003

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Defendant Juan Mares-Martinez has been indicted along with eight other defendants for narcotics trafficking offenses. The evidence that the government intends to offer at trial includes tape recordings of conversations involving Mares-Martinez that were intercepted pursuant to a wiretap of a California cellular telephone that he used and a separate wiretap of a Chicago cellular telephone belonging to his brother, Hugo Mares-Martinez. The latter wiretap was authorized by an order entered by this District's then-Chief Judge Marvin Aspen based on an affidavit of DEA Agent Sean Sears that included information garnered from the earlier California wiretap, which had been authorized by an order entered by a California state judge. Specifically, the information in Agent Sears' affidavit included summaries of conversations between Mares-Martinez and a then-unknown Chicago-area resident that had been intercepted pursuant to the California wiretap, referred to as "CA 99-5."

Mares-Martinez has moved for entry of an order suppressing all communications obtained pursuant to the CA 99-5 wiretap; all communications obtained pursuant to wiretap orders that were derived from the CA 99-5 wiretap, including the Chicago wiretap order; contraband seized through investigations that resulted from the CA 99-5 intercept and any

/3

derivative intercepts; as well as other fruits of the CA 99-5 intercept. Though his motion and supporting memoranda are not exactly models of clarity, it appears that Mares-Martinez contends that the CA 99-5 intercept was never properly authorized; the CA 99-5 wiretap was premised on illegally-obtained evidence; the affidavit used to obtain the CA 99-5 intercept contained material false statements and omitted material facts; the interceptions were not "minimized" as required by law; no notice to persons whose conversations were intercepted was provided; and the tape recordings were not properly sealed. Among other things, Mares-Martinez seeks a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), to establish his claim that the warrant applications were tainted by intentional false statements and omissions. For the reasons stated below, the Court concludes that Mares-Martinez is entitled to a hearing on his *Franks* claim but otherwise denies his motion to suppress.

### Facts concerning the wiretaps

It appears that the government intends to offer at trial certain of Mares-Martinez's conversations that were intercepted via the CA 99-5 wiretap, as well as conversations intercepted via the wiretap authorized by Chief Judge Aspen, which we will refer to as the "Chicago DEA wiretap." In addition, the Chicago DEA was premised in significant part on information garnered in the CA 99-5 wiretap. We will therefore begin with an examination of the circumstances that led to the CA 99-5 wiretap and will then discuss the Chicago DEA wiretap.

**A.     The CA 99-5 wiretap**

The CA 99-5 wiretap application, made in California state court by the Los Angeles County District Attorney, was supported by an affidavit from Detective Don Jones of the Los Angeles County Sheriff's Department. In his affidavit, dated March 27, 1999, Jones stated that

he was assigned to the Narcotics Bureau and was currently assigned to the Southern California

Drug Task Force, an operation funded by the United States Drug Enforcement Administration.

After summarizing his experience in investigating drug trafficking operations, Jones proceeded

to outline the basis for intercepting communications from three telephones, 818-697-0560

("Target Telephone #1"), subscribed to by Michael Rodrigues; 323-846-9136 ("Target Telephone

#2"), subscribed to by Javier Nevarez; and 661-250-0018 ("Target Telephone #3") subscribed to

by Isaias Ortiz Gonzalez, and communications among the users of those three telephones and

Nieves Montenegro-Nunez.

Jones reported that in August 1996, he had begun investigating a cocaine trafficking

organization in the Los Angeles area, and that he had obtained, in October and November 1996,

federal wiretap orders targeting two cellular telephones connected to what he referred to as the

"Alberto Beltran cocaine trafficking organization." These wiretaps resulted in the interception of

conversations concerning cocaine trafficking between Ortiz Gonzales and the targets of the

Beltran investigation. Jones summarized a series of conversations in November 1996 between

Ortiz Gonzales and the targets of the Beltran investigation in which, he said, the parties had

spoken in coded language about the delivery of 50 kilograms of cocaine to Gonzalez in return for

$590,000. Several days later, Jones stated, surveillance officers seized $587,500 in currency at

the United States / Mexico border from a person identified as a courier for the Beltran

organization. In early December 1996, officers working with Jones seized 1,495 kilograms of

cocaine and arrested the original targets of the investigation. Jones stated that following the

arrests, an unnamed "person in charge of this distribution organization" identified Ortiz Gonzalez

was one of the primary customers of the organization; Jones also stated that a ledger seized via a

3

search warrant for a house used by Beltran organization figures reflected that Ortiz Gonzales had received 50 kilograms of cocaine.

Jones' affidavit reported no further activities until late October 1998, when, he said, he was assigned to assist the Tucson, Arizona FBI office with surveillance of a drug smuggling organization believed to be responsible for transporting cocaine from Arizona to Southern California. On November 7, 1998, Jones stated, officers seized $1,400,000 in currency, a weapon, electronic pagers, and cellular telephones, and they arrested three individuals from Tucson and Nieves Montenegro-Nunez of Porterville, California, one of the targets of the CA 99-5 wiretap application. The events leading to arrest and seizure were not described in Jones' affidavit. Jones stated that an arrestee named Ira Friedman gave a statement to the authorities reporting that on October 31, 1998, he had driven a U-Haul truck containing 1,000 kilograms of cocaine from Tucson to Glendale, California, where he delivered it to two Hispanic men, including Nunez, the following day, and that the $1,400,000 seized on November 7 was partial payment for the cocaine.

Jones reported that he had reviewed telephone records for Friedman's and Nunez's cellular telephones for the period from October 22, 1998 through November 7, 1998. Among other things, the records for Nunez's phone revealed twelve calls to Target Telephone #1 on October 22, and two more on November 1, just a few hours after Nunez had picked up the cocaine. Jones opined that the calls to Target Telephone #1 were made to advise that the cocaine had been received. Shortly after this, Nunez received an incoming call from a cellular site close to the residence of Nevarez, the subscriber of Target Telephone #2 (evidently the records did not permit identification of the phone from which the incoming call was made). The next morning,

November 2, Nunez called Ortiz Gonzalez's cellular phone. Review of the records of Ortiz

Gonzalez's phone for October 25 through November 12 revealed two calls to Target Telephone

#1 on November 2, and one each on November 5, 6, 9, and 12. Jones opined that these calls

were made to arrange for the sale of cocaine.

Jones had also reviewed the records for Target Telephone #1 for October 29, 1998

through February 8, 1999. The records reflected a non-existent billing address. Target

Telephone #1 had dialed Ortiz Gonzalez' cell phone nine times during that period, including two

calls on November 1, just one hour after Nunez had called Target Telephone #1, and one more

call the next day. Jones opined that these calls reflected that the person using Target Telephone

#1 had received a shipment of cocaine and was arranging to sell part of it to Ortiz Gonzales. The

records of Target Telephone #2, also reviewed by Jones, reflected that the application, in the

name of Javier Nevarez, listed a driver's license number of a deceased 97 year old woman.

Target Telephone #2 had dialed Target Telephone #1 once on the morning of the cocaine

delivery (November 1), twice the next morning, and once the following morning. Target

Telephone #2 had also called Target Telephone #3 twenty-four times between September 5 and

December 7, 1998. Jones also stated that surveillance reports from September 1998 and

February 1999 reflected that Ortiz Gonzalez had been followed several times from his residence

to the home of the subscriber of Target Telephone #2, property owned by Ortiz Gonzalez and his

wife. Finally, Jones reported that the records for Target Telephone #3 indicated that Ortiz

Gonzalez was the subscriber. Target Telephone #3 had called Target Telephone #1 on

November 1, 1998, a few hours after Nunez received the cocaine and two minutes after Nunez

had called Target Telephone #1. Jones opined that this call was made to determine whether the

5

person using Target Telephone #1 had received any cocaine. During the period from September 8, 1998 through January 7, 1999, Target Telephone #3 had dialed Target Telephone #1 eighteen times and Ortiz Gonzalez's cell phone twelve times. Jones summarized by stating that the "calling patterns" of these telephones reflected that Ortiz Gonzalez and the users of Target Telephones #2 and #3 were calling the user of Target Telephone #1 to arrange for the purchase of cocaine from the latter.

Jones also reported that Task Force Officer Denise Oglesby had advised him that officers had followed Ortiz Gonzalez on a number of occasions and that he had used "counter-surveillance driving techniques" common to drug traffickers and that although Ortiz Gonzales had recently purchased a home, they had never seen him go to a place of employment.

Jones' affidavit also detailed his review of the results of previously-authorized pen registers (which had begun on November 1, 1998) on the target telephones, as well as additional telephone records. These reflected, among other things, numerous calls between Target Telephone #1 and three cellular telephones and a pager in the Chicago area.

Jones' affidavit also contained a discussion of why other methods of investigation were "not likely to succeed in identifying the full scope of [the] conspiracy." Jones Affidavit, p. 37. First, Jones stated, "[t]here are no confidential informants or undercover agents in a position to assist with the current investigation targeting [Ortiz] Gonzalez, Rodriguez, and Nunez." *Id.* Second, the subscriber of Target Telephone #1 had not been identified. Third, surveillance of Ortiz Gonzalez had been largely unsuccessful, due partly to Ortiz Gonzalez's success in evading surveillance officers. Fourth, surveillance of the home of the subscriber of Target Telephone #2 was impractical due to the physical layout of the residence and the strong likelihood of detection.

6

Fifth, investigating officers had not identified any location used to "stash" cocaine, and though they were aware of the residences of several of the participants, the possibility of obtaining paper evidence of a conspiracy via search warrants was outweighed by the fact that this tactic would expose the investigation. Sixth, pen registers, though valuable in producing circumstantial evidence of a conspiracy, do not disclose the contents of telephone communications. And finally, Jones opined that although Nunez and the targets of the Beltran investigation might have some information about the activities of Ortiz Gonzalez and the user of Target Telephone #1, giving immunity to Nunez was "not desirable" due to the extent of his own criminal activities, and any information possessed by targets of the Beltran investigation was likely stale.

The wiretap authorization was issued by Los Angeles County Superior Court Judge Larry Fidler on March 30, 1999.

## B.    The Chicago DEA wiretap

Chief Judge Aspen's order authorizing the Chicago DEA wiretap was issued following his review of a May 19, 1999 affidavit signed by DEA Special Agent Sean Sears, who sought authorization to intercept "Target Phone 1," a cell phone subscribed to by Froilan Guaderramma of Cicero, Illinois, as well as communications received by a particular pager, "Target Pager 1." Sears averred that there was probable cause to believe that Guaderramma, Armando Castillo-Carrillo, also known as Victor Najera, Michael Rodrigues, Javier Nevarez, Isaias Ortiz Gonzalez; Nieves Montenegro-Nunez; and Juan Mares-Martinez,[1] also known as "El Senor," were involved in illegal narcotics trafficking and that the wiretap would uncover evidence of this activity.

Sears' affidavit reported that Castillo-Carrillo had previously been arrested in 1994 for

---

[1]  Sears' affidavit referred to Mares-Martinez as "Martinez-Mares."

attempting to transport 119 pounds of marijuana from Tucson to Phoenix, Arizona, and in 1998 in Illinois while unloading a trailer containing a large quantity of marijuana; the dispositions of these cases were not reported. Rodrigues was identified as the subscriber of "CA Phone A," the same phone as "Target Telephone #1" in the CA 99-5 wiretap; Nevarez as the subscriber of "CA Phone B," the same phone as "Target Telephone #2" in the CA 99-5 wiretap; and Ortiz Gonzalez as the subscriber of "CA Phone C," the same phone as "Target Telephone #3" in the CA 99-5 wiretap. Mares-Martinez was believed to be the user (though evidently not the subscriber)[2] of CA Phone A, as well as two other cellular telephones registered in California, referred to as CA Phones D and E, though the basis for this belief was not described in the affidavit. Sears' affidavit stated that Mares-Martinez had been arrested in August 1998 for possession of sixty-one kilograms of cocaine and four weapons.

Sears' affidavit recounted essentially the same information as Jones' CA 99-5 affidavit with respect to the events of October-November 1998 involving Ira Friedman's delivery of cocaine to Nunez, the telephone calls between Nunez and the user of CA Phone A during that same period, and the belief of the Los Angeles County Sheriff's Department that Nunez had called CA Phone A to make arrangements to sell part of the cocaine Nunez had received. Sears also recounted Task Force Officer Oglesby's reports regarding Ortiz Gonzalez's efforts to evade surveillance and his apparent lack of employment.

The core of Sears' affidavit, however, involved communications that had been intercepted pursuant to the CA 99-5 wiretap; according to Sears, these conversations reflected that Mares-

---

[2] There is some indication that "Michael Rodrigues," the subscriber of CA Phone A / Target Telephone #1, was a name used by Juan Mares-Martinez.

Martinez and others were conducting large scale narcotics transactions in California and Illinois. The affidavit said that Mares-Martinez was the user of CA Phone A, but it did not describe the basis for that belief. On March 31, 1999, the day that the CA 99-5 wiretap began, the user of CA Phone A called Target Phone 1, did not reach the user of that phone, then left a call back number of Target Pager 1. Telephone records reflected that there had ensued a series of calls between Target Phone 1 and CA Phone A on March 31 which were intercepted via the wiretap. Sears summarized the contents of these calls and opined that they involved coded discussions concerning the delivery of a total of 246 kilograms of cocaine from the user of CA Phone A to the user of Target Phone 1, in return for a total of $350,000; arrangements for obtaining additional quantities of cocaine; and delivery of another thirty kilograms of cocaine the following day. Sears also summarized a series of calls between the users of the two telephones in early April, which Sears interpreted as further discussions about the delivery and sale of cocaine. Sears also summarized several calls made from CA Phone A to other Chicago-area telephones which he likewise interpreted as coded conversations regarding cocaine transactions, as well as the results of his examination of telephone records which showed a significant number of calls between Target Phone 1 and CA Phone A; between Target Phone 1 and another Chicago-area cell phone, subscribed to by Victor Najera, which itself had a significant volume of calls with CA Phone A; and between CA Phone A and Target Pager 1.

Sears' affidavit also included a section explaining why he believed that alternative investigative procedures had been tried and failed, appeared unlikely to succeed if tried, or were too dangerous to employ. Among other things, Sears stated that "[l]aw enforcement officers involved in this investigation have not [been] able to utilize confidential sources to assist in this

9

investigation," and that even if they had done so it was unlikely that any member of the organization would discuss the full extent of the organization's activities and membership. Sears Affidavit, ¶40; *see also id.,* ¶44. Sears also reported on the targets' use of counter-surveillance techniques and that the person using CA Phone D had told the user of Target Phone 1 that police surveillance had been observed during the early stages of a narcotics transaction on May 7, 1999, thus suggesting, Sears stated, that surveillance was unlikely to succeed. Even if surveillance did succeed, Sears stated, it would not disclose the contents of conversations among the alleged conspirators. Sears stated that toll records and pen registers, though valuable in producing circumstantial evidence of conspiracy, likewise would not disclose the contents of communications. For these and other reasons, Sears concluded that wire interception was necessary to meet the investigation's objectives.

Chief Judge Aspen authorized the wiretap on May 19, 1999.

## Discussion

### A. Defendant Mares-Martinez's arguments

Mares-Martinez makes a series of arguments that he contends require the suppression of the fruits of the CA 99-5 and Chicago DEA wiretaps. He argues that (1) the CA 99-5 application was not properly signed by the LADA; (2) the CA 99-5 wiretap was approved by a judge not authorized to order wiretaps; (3) the application for the CA 99-5 wiretap did not establish probable cause; (4) the CA 99-5 application contained material falsehoods and omitted material facts; (5) the CA 99-5 application was the fruit of illegal wiretaps, in particular the wiretaps obtained in connection with the Beltran investigation and another series of wiretaps referred to as the "Atel" wiretaps; (6) the agents supervising the CA 99-5 wiretap failed to comply with the

10

statutory obligation to minimize the interception of communications not properly subject to interception; (7) the authorities failed to give the requisite notice to persons whose communications were intercepted; and (8) the tapes of recorded conversations were not properly sealed. Mares-Martinez also appears to argue that the Chicago DEA wiretap application contained material false statements and material omissions.

As a threshold matter, the government argues that Mares-Martinez's motion should be denied because he has made no direct challenge to the veracity of Agent Sears' affidavit offered in support of the Chicago DEA wiretap. Both the premise and the conclusion the government seeks to draw from it are incorrect. First, Mares-Martinez argues, and the government does not dispute, that Agent Sears' affidavit falsely stated that Mares-Martinez had been arrested in 1998 for cocaine and weapons possession. Second, Mares-Martinez appears to argue that Agent Sears' affidavit suffers from the same critical omissions and/or misstatements that he argues infected Detective Jones' CA 99-5 affidavit. Third, Mares-Martinez argues, and the government does not dispute, that the government intends to offer at trial tapes of conversations involving Mares-Martinez that were intercepted via the CA 99-5 wiretap. The legality of CA 99-5, and thus the admissibility of conversations intercepted pursuant to that wiretap, have nothing to do with Agents Sears' affidavit. Finally, Mares-Martinez contends that the Chicago DEA wiretap was derived from the purportedly unlawful CA 99-5 wiretap, which, he argues, renders the fruits of the Chicago wiretap inadmissible under 18 U.S.C. §2515 irrespective of whether the Chicago DEA wiretap is independently shown to be unlawful. For these reasons, the Court rejects the government's argument that the motion to suppress should be denied summarily and therefore turns to the specific arguments made by Mares-Martinez.

**B.     Authorization of the CA 99-5 wiretap**

We can dispose quickly of Mares-Martinez's arguments regarding various aspects of the

procedures used to obtain authorization for the CA 99-5 wiretap. First, he argues that the warrant

application did not satisfy the statutory requirement that applications for wiretaps be authorized

only by designated high-ranking officials. *See* 18 U.S.C. §2516(2). California limits

authorization for making wiretap applications to the local District Attorney and requires that the

application contain, among other things, a statement by the District Attorney attesting to his

review of the application and supporting circumstances. Cal. Penal Code §629.50(c). Mares-

Martinez points out that the Los Angeles District Attorney reviewed and signed the warrant

application the day before Jones signed his affidavit. Thus, Mares-Martinez contends, the LADA

could not possibly have reviewed the supporting circumstances, and his statement that he had

reviewed the affidavit must be false. This is a *non sequitur*. The fact that Jones' affidavit was

not signed does not mean that the LADA did not review the affidavit or the circumstances it

described. The Court is satisfied that the procedure followed by the LADA in this case complied

with statutory requirements.

Second, Mares-Martinez argues that the order authorizing CA 99-5 was not signed by the

presiding judge of the Los Angeles County Superior Court, as required by California statute. *See*

18 U.S.C. §§2518(1), 2510(9)(b) (authorizing signature by a state criminal court judge

authorized by state statute to issue wiretap orders); Cal. Penal Code §629.50(c). But the

government has demonstrated that Judge Fidler was specifically designated by order of the

presiding judge of the Los Angeles County Superior Court to sign wiretap orders. *See* Govt.

Response, Ex. A. Judge Fidler's his issuance of the order complied with statutory requirements.

## C.   Probable cause in the CA 99-5 application

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§2510-2522, generally prohibits interception of wire and electronic communications except as authorized under the statute. *Id.* §2511. Section 2518 provides the requirements that govern applications for and entry of orders authorizing intercepts. The application must be made in writing under oath and must include, among other things, "full and complete statement[s]" of the facts and circumstances relied on by the applicant to justify his belief that an order should be issued, whether other investigative procedures have been tried and failed or why they reasonably appear to be too dangerous or unlikely to succeed if tried, and the facts concerning all previous applications made to any judge for authorization to intercept communications involving any of the persons, facilities, or places described in the application. *Id.* §2518(1). Before granting authorization, the judge must determine that there is probable cause to believe that a person is committing, has committed, or is about to commit one of the offenses listed in 18 U.S.C. §2516; that there is probable cause to believe that communications concerning that offense will be obtained through the interception; that normal investigative procedures have been tried and have failed or reasonably appear to be too dangerous or unlikely to succeed if tried; and that there is probable cause to believe that the facilities from which the communications are to be intercepted are being or are about to be used in connection with the offense, or are listed to or commonly used by a person identified in the application. *Id.* §2518(3).

The standard for probable cause under Title III is identical to that under the Fourth Amendment. *E.g., United States v. Leisure,* 844 F.2d 1347, 1354 (8th Cir. 1988). Probable cause exists when the totality of the circumstances reveals a reasonable probability of criminal

activity. *United States v. Levy,* 990 F.2d 971, 973 (7th Cir. 1993); *United States v. Dorfman,* 542

F. Supp. 345, 359 (N.D. Ill. 1982), *aff'd sub nom. United States v. Williams,* 737 F.2d 594 (7th

Cir. 1984). The affidavit submitted in support of the Title III application must contain facts

sufficient to warrant a person of reasonable caution to believe that criminal activity is afoot and

that evidence of that activity will be captured via the intercept. 18 U.S.C. §2518(3);

*Dorfman,* 542 F. Supp. at 359. The Court must examine at the totality of the circumstances, *see*

*Illinois v. Gates,* 462 U.S. 213, 230-32 (1983), and should not treat as a separate universe each

aspect of the showing made in the application. *Leisure,* 844 F.2d at 1354-55. And the possibility

of an innocent explanation for the activity described in the application does not negate probable

cause, so long as there is a reasonable probability of criminal activity. *Levy,* 990 F.2d at 973.

Applying these standards, the Court finds that Detective Jones' affidavit made a showing

sufficient to establish probable cause with respect to the CA 99-5 application, though perhaps

just barely. Jones' reliance on the subjects' use of cellular phones, prepaid cellular phones, and

pagers, and on their calling patterns, in and of itself does not establish probable cause and likely

does not even raise a suspicion of criminal activity. Though it could perhaps have been said as

recently as ten to fifteen years ago that frequent use of a cell phone, a prepaid phone card, or a

pager was at least suggestive of possible involvement in criminal activity, the same plainly

cannot be said in 2002 and could not have been said in 1999. Cell phones have become

ubiquitous and are, for many law-abiding persons, the primary method of telephone

communication due to their ease of use, portability, and in many locales, their relative

inexpensiveness. Pagers have likewise become a common appliance for persons pursuing lawful

occupations, including physicians, lawyers, traveling sales people, and others. As the use of

14

these devices has become more and more common, the probative value of frequent contacts among their users as an indication of criminal activity has decreased; for example, most parents of teenagers in middle class urban areas could attest that frequent calls between and among cell phones indicates nothing more than that the participants are friends. But Jones' affidavit disclosed more than frequent use of cell phones and frequent contacts among the users of the target telephones; Jones was able to relate certain of those contacts to the narcotics transaction revealed by the authorities' interview of Ira Friedman and other suspicious activities among the participants. The juxtaposition of these events with the telephone contacts revealed by Jones' examination of telephone records was sufficient to warrant a reasonable person to believe that the users of the subject telephones were involved in joint criminal activity the details of which might be revealed by interception of their calls.

## D.      Challenge to the Beltran and Atel wiretaps

Mares-Martinez argues that the CA 99-5 wiretap was the fruit of illegal wiretaps conducted by the California authorities in the Beltran investigation and another investigation concerning a cellular phone company called Atel. He does not contend, however, that these wiretaps involved any phones that he owned or used or that they resulted in the interception of any conversations in which he was a participant. Under Title III, an individual has standing to challenge only interception that was directed at him or that resulted in interception of conversations in which he participated. 18 U.S.C. §2518(10)(a) (giving standing to any "aggrieved person"); *id.* §2510(11) (defining "aggrieved person" as a person who was a party to an intercepted communication or a person against whom the interception was directed). A similar standard governs challenges under the Fourth Amendment. *Alderman v. United States,*

15

394 U.S. 165, 171-72 (1969). Mares-Martinez thus lacks standing to challenge the Beltran and Atel wiretaps.

**E.     Minimization**

Mares-Martinez claims that the agents failed to comply with the statutory obligation to "minimize the interception of communications not otherwise subject to interception" under Title III. 18 U.S.C. §2518(5). "What the minimization requirement means, essentially, is that once the monitoring agent has had a reasonable opportunity to assess the nature of an intercepted communication, he or she must stop monitoring that communication if it does not appear relevant to the government's investigation." *United States v. Mansoori,* 305 F.3d 635, 646 (7th Cir. 2002). Mares-Martinez cites six conversations that did not involve any of the court-approved targets of the interception. *See* Motion to Suppress, p. 38.

In assessing the sufficiency of the government's efforts to minimize, a court must determine whether the steps the agents took to minimize the interception of communications unrelated to the investigation were objectively reasonable given the circumstances they confronted. *See Scott v. United States,* 436 U.S. 128, 137 (1978). "Although the adequacy of the government's minimization efforts necessarily depends on the facts of each case, relevant considerations include the kind and scope of criminal enterprise that the government was investigating, the thoroughness of the government's efforts to ensure that nonpertinent calls will be minimized, the extent to which the government could have foreseen that certain types of conversations would be innocuous and thus subject to minimization, use of code, and the extent to which the authorizing judge oversaw the interception efforts." *Mansoori,* 305 F.3d at 647.

The alleged conspiracy that the government was investigating was wide-ranging and

16

involved a number of participants who commonly spoke in coded language, factors that tilt in favor of giving the investigating agents a reasonable degree of latitude. *Id.* Moreover, it is undisputed that the government submitted periodic reports of its surveillance to Chief Judge Aspen, another factor that suggests that it acted in good faith. *Id.* Though the government has made no effort to advise the Court of what the agents did to ensure that non-pertinent calls would be minimized, in this particular case its failure to make this ordinarily-required showing does not tilt the scales in favor of suppression. As the Seventh Circuit has recently indicated, were this Court to find that the minimization requirement was violated, the appropriate relief likely would be to suppress only those conversations that were inappropriately monitored – none of which, it appears, involved any of the defendants in this case and none of which, it appears, will be offered at trial. *See Mansoori,* 305 F.3d at 647, citing *United States v. Charles,* 213 F.3d 10, 22 (1st Cir. 2000) with approval for the proposition that partial suppression of those conversations intercepted improperly is the usual remedy for inadequate minimization and that wholesale suppression of all intercepted conversations is reserved for the "particularly horrendous case." Mares-Martinez has given the Court no reason to believe that this is the "horrendous case" of non-minimization contemplated by *Charles* and *Mansoori*; the half-dozen conversations he cites constitute only a tiny fraction of those intercepted pursuant to the Chicago DEA wiretap. Though the government ought to have provided the Court with evidence of its minimization efforts, its failure to do so does not require granting Mares-Martinez's motion to suppress.

**F.**     **Notice and sealing**

Title III and the California wiretap statute require notice of a wiretap to be served upon all persons named in a wiretap application or order, all persons intercepted, and the owners of any

intercepted premises, within a reasonable time but not less than ninety days after the expiration of the order. 18 U.S.C. §2518(8)(d); Cal. Penal Code §629.68. Mares-Martinez says that he first learned of the wiretap via discovery in this case; he contends that this did not comply with the statute. But nothing in the statute or any case cited by Mares-Martinez says that notification via discovery in a criminal case is *per se* deficient; the primary issue concerns the timing of the notice. Although Mares-Martinez has provided the Court with no information concerning when the CA 99-5 and Chicago DEA wiretap orders expired, it seems apparent that the orders expired more than six months before the return of the indictment in this case in late June 2000. Failure to provide the requisite notice, however, does not require suppression of the entirety of the fruits of a wiretap. *See, e.g., United States v. DeJesus,* 887 F.2d 114, 117 (6th Cir. 1989) (citing *United States v. Donovan,* 429 U.S. 413, 438 (1977)). Mares-Martinez has made no showing of prejudice stemming from the lack of notice and has made no argument particularized to the circumstances of this case as to why suppression is appropriate. On the other hand, the government has made no effort to explain why the required notice was not given. For these reasons, the Court directs the government to make a written submission within fourteen days of this order explaining the failure to give timely notice and overrules Mares-Martinez's argument, without prejudice to renewal following receipt of the government's submission.

Title III requires that recordings of intercepted conversations be sealed immediately upon the expiration of the wiretap order. 18 U.S.C. §2518(8)(a). Mares-Martinez contends that the discovery produced in this case reflects discrepancies concerning the authenticity of some recordings, and he infers from this that the recordings may not have been properly sealed. Though the inference is not necessarily reasonable even if one accepts Mares-Martinez's claims

18

concerning discrepancies (an issue the Court need not now address), the government contends that the tapes were in fact sealed. It appears from the parties' submissions, however, that the government has not provided the defense with copies of the sealing orders. The Court orders the government to produce to the defendants, within fourteen days of this order, copies of all sealing orders and all ten-day reports submitted to Chief Judge Aspen that have not heretofore been produced. Mares-Martinez's arguments regarding sealing are overruled, without prejudice to renewal if evidence of violation of the statutory sealing requirement turns up.

G.     **Misstatements / omissions in the CA 99-5 and Chicago DEA wiretap applications**

Mares-Martinez's primary argument concerns allegedly material misrepresentations and omissions in the CA 99-5 and Chicago DEA wiretap applications. A search that takes place pursuant to a warrant issued as a result of material and deliberate false statements or omissions violates the Fourth Amendment, requiring suppression of the fruits of the search. *See Franks,* 438 U.S. at 165. To obtain a hearing under *Franks,* a defendant must make a substantial preliminary showing that the warrant application contained a false statement or material omission; that this was done knowingly or with reckless disregard for the truth; that, in the case of a false statement, the affidavit does not establish probable cause if the false statement is excised; and that, in the case of an omission, the affidavit would not support a finding of probable cause if the omitted material were included. *Id.* at 155-56; *United States v. McNeese,* 901 F.2d 585, 593-94 (7th Cir. 1990); *United States v. Williams,* 737 F.2d 594, 604 (7th Cir. 1984). *See also United States v. Jackson,* 65 F.3d 631, 635 (7th Cir. 1995).

Mares-Martinez argues that Agent Sears falsely stated in the Chicago wiretap application that Mares-Martinez had been arrested for cocaine and weapons possession. The government

does not dispute this claim. But because Mares-Martinez does not argue that this statement was material standing alone (nor could he do so successfully), we turn to the primary issue raised by Mares-Martinez, namely his claim that the government failed to disclose that Isaias Ortiz Gonzalez, one of the alleged participants in the conspiracy identified in both wiretap applications, was actually a confidential government informant prior to the CA 99-5 application, and that it misrepresented in its "necessity" showing in both applications that there were no confidential informants.

The government contends that even if Mares-Martinez were correct regarding Ortiz Gonzalez, his failure to make a showing that DEA Agent Sears was aware of Ortiz Gonzalez's status dooms his motion to suppress. The Court disagrees. First of all, as noted earlier, it appears that the government will offer at trial recorded conversations involving Mares-Martinez that were intercepted via the CA 99-5 wiretap; the state of Agent Sears' knowledge has no bearing on the legality of the CA 99-5 wiretap application. Second, a showing that the CA 99-5 wiretap order was unlawfully obtained likely would taint the fruits of the Chicago wiretap as well. Under 18 U.S.C. §2515, evidence derived from an unlawful wiretap is inadmissible. It is beyond question that the Chicago wiretap authorization was derived from the fruits of the CA 99-5 wiretap; the showing of probable cause in Agent Sears' affidavit was premised in significant part on conversations purportedly involving Mares-Martinez that were overheard pursuant to the CA 99-5 intercept. Thus the government cannot escape examination of the legality of the CA 99-5 wiretap simply by arguing that Agent Sears had no knowledge of any illegality. *See, e.g., United States v. Giordano*, 416 U.S. 505, 530-33 (1974); *United States v. Spagnuolo*, 549 F.2d 705, 712 (9th Cir. 1977). Finally, though *Franks* requires a showing that the affiant intentionally

20

misrepresented or recklessly disregarded the truth, it covers cases in which one government agent intentionally or recklessly misrepresents the truth to another, who innocently includes the misrepresentation in his affidavit. *See, e.g., United States v. Pritchard,* 745 F.2d 1112, 1118 (7th Cir. 1984); *United States v. Kennedy,* 131 F.3d 1371, 1376 (10th Cir. 1997); *United States v. Wapnick,* 60 F.3d 948, 956 (2d Cir. 1995); *United States v. DeLeon,* 979 F.3d 761, 763-64 (9th Cir. 1992); *United States v. Calisto,* 838 F.2d 711, 714 (3d Cir. 1988). The reasons for this are fairly obvious: if the rule were otherwise, the privacy rights protected by *Franks* would be meaningless, as the government could invariably "launder" misrepresentations through unwitting agents and thereby avoid scrutiny altogether.

Mares-Martinez's claim that Ortiz Gonzalez was an informant is supported by the affidavit of Frank Panessa, a former DEA Special Agent. Panessa worked as a DEA Special Agent in the New York office from 1968 through 1979 and in that capacity served on DEA-sponsored drug task forces including with local law enforcement officers. He was later group supervisor of an Enforcement Group at the New York DEA office; Inspector in the DEA Office of Internal Security at Ft. Lee, New Jersey; staff coordinator in the Dangerous Drugs Investigation Section at DEA headquarters; and a DEA "country attache" in Rome, Italy. He ended his DEA career in 1995 as Assistant Special Agent in Charge of the DEA's Philadelphia office. Panessa says that he has served as the affiant in connection with many wiretap applications, supervised investigations involving wiretaps, participated in and supervised numerous investigations of narcotics trafficking, participated in internal DEA investigations regarding unauthorized wiretaps as well as other claims of law enforcement misconduct, and has overseen the activities of over a hundred confidential informants.

21

Panessa has reviewed the discovery provided by the government in this case, including the CA 99-5 and Chicago DEA wiretap applications, the DEA-6 reports produced in discovery, and affidavits and applications in a number of other California wiretaps in matters related in one way or another to the CA 99-5 and Chicago DEA investigations. He has concluded from his examination of these materials and application of his own knowledge, training, and experience that Ortiz Gonzalez became a government informant at some time after he was intercepted in the Beltran investigation. According to Panessa, Ortiz Gonzalez was claimed by the agents investigating the Beltran matter to be part of a cocaine trafficking organization, and the agents heard him discussing a number of cocaine transactions in the intercepted communications. Despite this, he was not indicted along with the other targets of the Beltran wiretap order. Panessa notes that although Ortiz Gonzalez and his nephew and son were also intercepted targets in several of the other California wiretaps he has reviewed, they have not been charged with any crime. One of those wiretap applications, Panessa says, reflects that on April 15, 1999, Ortiz Gonzalez called and requested to meet the as-yet unidentified person using CA 99-5 Target Telephone #1; the meeting was kept under surveillance by law enforcement and served as the basis for identification of Mares-Martinez as the user of that phone. According to Panessa, his review of the pertinent materials reflects that Ortiz Gonzales called for this meeting "with no apparent reason" and, upon being told by the other participant that the location was under surveillance, replied that he had checked and that law enforcement was not around. Panessa opines that Ortiz Gonzales arranged the meeting to assist law enforcement in identifying the person using Target Telephone #1.

Panessa concludes from these facts – law enforcement's failure to charge Ortiz Gonzalez

or his relatives with a crime, and Ortiz Gonzalez's supposedly otherwise-unexplained insistence on a face-to-face meeting with a person whom law enforcement was trying to identify – that Ortiz Gonzales was not truly a target of the CA 99-5 wiretap but rather was a confidential informant.[3] If he is correct, the representations in the CA 99-5 and Chicago DEA wiretap applications that there were no confidential informants were untrue, and the claims that normal investigative procedures have been tried and have failed or are unlikely to succeed if tried – an essential prerequisite under Title III, *see* 18 U.S.C. §2518(3)(c) – were untrue, or at least omitted a significant fact.

The government argues that Panessa's statements should be disregarded entirely, as he has not been properly qualified as an expert under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (19983). The Court disagrees. The government's argument that Panessa is not an expert on wiretaps or wiretap affidavits, *see* Govt. Response, p. 14, misses the point. Panessa has given no opinion regarding wiretaps or wiretap affidavits; rather he has given an opinion in which he draws inferences from the manner in which the government's narcotics trafficking investigation was conducted. It is beyond question that Panessa is more than adequately qualified to render expert testimony concerning the conduct of a narcotics investigation. It is a closer question whether he is qualified to draw inferences from investigative materials regarding whether a particular person served as an informant, *see* Govt. Response, p. 15, but in the Court's view this affects only the weight to be given Panessa's

---

[3] Panessa also relies on the apparent lack of documentation of any further investigation regarding Ortiz Gonzalez and his relatives. It is not clear to the Court, however, whether such documentation would be expected to have been included in the materials produced to or obtained by the defense in this case.

testimony, not its admissibility. What Panessa has done is essentially to point out that the government had ample evidence of Ortiz Gonzalez's criminality and every reason to prosecute him, but evidently failed to pursue that course, and appears to have stopped investigating him. This, Panessa states, suggests to him as an experienced narcotics investigator that the authorities had some sort of an arrangement with Ortiz Gonzalez. In the Court's view, Panessa's extensive experience as a narcotics investigator, and his extensive experience in supervising, monitoring, and investigating narcotics investigations undertaken by others, provide a sufficient basis to permit him to draw such inferences from the otherwise-unexplained evidence. There may be other reasonable explanations of this evidence, and it is certainly possible that Panessa has overlooked other evidence or has insufficient information concerning the various investigations to draw that inference. But the government has not argued those points, and in any event they are matters that would affect the weight of Panessa's testimony, not its admissibility. *See Daubert,* 509 U.S. at 595 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

The Court also rejects the government's argument that Panessa is being offered as an impermissible expert concerning the credibility of other witnesses, namely the affiants in the CA 99-5 and Chicago DEA applications. The Court wholeheartedly agrees with the proposition that "[c]redibility is not a proper subject for expert testimony." *See* Govt. Response, p. 17 (quoting *United States v. Vest,* 116 F.3d 1179, 1185 (7th Cir. 1997), and citing *United States v. Benson,* 941 F.2d 598, 604 (7th Cir. 1991)). But Panessa has not opined that either of the affiants lacks credibility or that they intentionally or recklessly misrepresented the truth. Rather he has drawn

24

on his experience regarding the manner in which narcotics investigations are conducted, in much the same way that expert narcotics investigators are offered by the government as expert witnesses to render opinions concerning and based on the manner in which narcotics organizations conduct their business. *See, e.g., United States v. Allen,* 269 F.3d 842, 845-46 (7th Cir. 2001); *United States v. Mancillas,* 183 F.3d 682, 705 (7th Cir. 1999). The fact that Panessa's expert testimony may have a collateral effect on the Court's eventual judgment regarding another person's credibility does not render the testimony inadmissible under *Vest* or *Benson.*[4]

The government makes no other challenge to Panessa's affidavit; it has put all of its eggs into the *Daubert / Vest* basket. The Court does not find Panessa's affidavit entirely convincing. By way of example, he seems to read far too much into the circumstances of the April 15, 1999 meeting between Ortiz Gonzalez and Mares-Martinez that he opines was set up to allow the authorities to identify the then-unknown user of CA 99-5 Target Telephone #1. That meeting is disclosed in the application that led to a wiretap referred to as CA 99-14, authorized by a California state court judge. *See* CA 99-14 Application, Affidavit of Don R. Jones, pp. 18-19. But the April 15 meeting was not the only meeting between Ortiz Gonzalez and the user of Target Telephone #1. The same application refers to a conversation recorded on April 5, 1999, which the user of CA 99-5 application Target Telephone #1 told the person with whom he was speaking that he was together with his "compadre," identified in the application as Ortiz

---

[4] For example, one proper purpose of expert testimony is to show to the trier of fact that a commonly held belief is incorrect. *See, e.g., United States v. Lamarre,* 248 F.2d 642, 648 (7th Cir. 2001). Such testimony almost inevitably has an impact on the fact finder's judgment of other witnesses' credibility, but it is nonetheless admissible.

Gonzalez. In addition, the application for renewal of the CA 99-5 wiretap, which Panessa also

reviewed, reflects that another meeting between Mares-Martinez and Gonzalez took place just a

few days later, on April 19, 1999, this one arranged not by Ortiz Gonzalez but by Mares-

Martinez. *See* CA 99-5 Extension No. 1 Application, Affidavit of Don R. Jones, pp. 22-23.

Mares-Martinez drove to this meeting in the same rental car whose license plate had been used to

identify him following the April 15 meeting. It is difficult to see why, if Ortiz Gonzalez was an

informant, he would have needed to set up a special meeting just to identify a person with whom

he met and dealt so regularly. In addition, the CA 99-14 wiretap application references a

significant number of conversations between Ortiz Gonzalez and Mares-Martinez in the days

leading up to April 15, all of which appear to have concerned an impending sale of cocaine to

Ortiz Gonzalez; this could explain why Ortiz Gonzalez was meeting with Mares-Martinez, thus

tending to undercut Panessa's inference that there was "no apparent reason" for the meeting to

take place. In sum, the April 15 meeting likely does not support the weight that Panessa seeks to

place on it.

The authorities' failure to prosecute Ortiz Gonzalez following the interception of his

conversations via the Beltran wiretap or following the interception of his communications in the

CA 99-5 wiretap likewise may have a reasonable explanation other than the one that Panessa

infers. But as the Court has noted, the government does not challenge Panessa's affidavit on this

basis and offers no independent explanation for why Ortiz Gonzalez was not and has not been

prosecuted. In addition, though the showing needed to obtain a hearing under *Franks* "must be

more than conclusory" and "must be accompanied by an offer of proof," *see Franks,* 438 U.S. at

171, it stands to reason, as one leading commentator persuasively maintains, that the preliminary

showing needed to obtain a hearing need not satisfy the preponderance-of-the-evidence standard

needed following a hearing to establish deliberate falsehood or reckless disregard. *See* 2 W.

LaFave, Search and Seizure §4.4(d) at 504, 506 (1996 & Supp. 2003). Based on the materials

the parties have submitted, the Court is persuaded that Mares-Martinez has made the necessary

"substantial preliminary showing" under *Franks* with regard to Ortiz Gonzalez's status.

If, as Panessa concludes, Ortiz Gonzalez was in fact an informant, Detective Jones, who

was intimately familiar with the Beltran investigation and in charge of the CA 99-5 investigation,

reasonably would be expected to have known it. And as indicated earlier, the Court cannot

conclude that the wiretap applications would have passed muster absent the alleged falsehood

and/or with the allegedly omitted information included. For these reasons, Mares-Martinez is

entitled to a hearing under *Franks* with respect to both wiretap applications. The hearing will be

narrowly focused on the question whether Ortiz Gonzalez was an informant, cooperating

individual, or had provided information to the investigators at or before the submission of the CA

99-5 wiretap application. At the status hearing scheduled for January 7, 2003, the Court will set

a date for the *Franks* hearing.

**H.      Request pursuant to 18 U.S.C. §3504**

Mares-Martinez has also requested that the government be directed to affirm or deny that

Ortiz Gonzalez was an informant, a cooperating individual, or had provided information to the

authorities investigating the Beltran matter or the matters disclosed in the CA 99-5 wiretap

application at the time of or prior to the submission of that application. The request is based on

18 U.S.C. §3504(a)(1), which provides as follows:

　　　　(a)      In any trial, hearing, or other proceeding in or before any court, grand jury,

department, officer, agency, regulatory body, or other authority of the United States -

> (1)     upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act.

18 U.S.C. §3504(a)(1). There is no question that Mares-Martinez is an "aggrieved party" with respect to his claim of intentional or reckless misstatements and omissions from two wiretap applications. The Court therefore directs the government to affirm or deny, within 14 days of this order, whether Isaias Ortiz Gonzalez was an informant, a cooperating individual, or had provided information to the authorities investigating the Beltran matter or the matters disclosed in the CA 99-5 wiretap application at the time of or prior to the submission of that application.[5]

## I.     Renewed motion for discovery

Mares-Martinez's motion contains a perfunctory renewal of an earlier request for discovery that was ruled upon by Judge Hibbler when the case was still assigned to him. *See* Motion to Suppress, p. 2. Mares-Martinez has failed to set forth any proper basis for reconsideration of that ruling. The motion is denied. The Court also denies Mares-Martinez's request for identification of the make and model of pen register and other equipment used in the investigation, *see* Motion to Suppress, p. 37, as he has failed to support that request with any showing of legitimate need outweighing the government's security-related concerns.

---

[5]  Mares-Martinez makes a similar request concerning other issues, *See* Motion to Suppress, p. 40, but the Court's finding is limited to those issues on which it has concluded that a hearing is warranted.

## J.    Defendant Trinidad's motion to adopt

Defendant Henry Trinidad has filed a motion to adopt Mares-Martinez's motion to suppress. He has failed to identify any facts that would indicate that the grounds stated in Mares-Martinez's motion apply to him, for example, that his own conversations were intercepted as a result of the CA 99-5 or Chicago DEA wiretap. The Court does not intend to do Trinidad's work for him. The motion is denied.

## K.    Defendant Hugo Mares-Martinez's motion to adopt

Defendant Hugo Mares-Martinez's motion to adopt Juan Mares-Martinez's motion to suppress, though equally barren of supporting detail, nonetheless fares better. The facts set forth in Juan's motion reflect that Hugo's telephone and some of his conversations were intercepted via the Chicago DEA wiretap. Though Hugo has not provided the Court with any basis giving him standing to attack the CA 99-5 wiretap, he is granted leave to adopt Juan's motion to suppress the Chicago DEA wiretap based on *Franks v. Delaware*.

### Conclusion

For the reasons stated above, defendant Juan Mares-Martinez's motion to suppress evidence [docket item 112-1] is denied except with respect to the claim of material misrepresentations and/or omissions in the CA 99-5 and Chicago DEA wiretap applications. His request for a hearing on that aspect of the motion [item 112-4] and his request to have the government admit or deny various matters [item 112-3] are granted. At the January 7, 2003 status hearing, the Court will set a hearing date. Mares-Martinez's renewed motion for discovery [item 112-2] is denied. Defendant Trinidad's motion to adopt [item 127-1] is denied. Defendant Hugo Mares-Martinez's motion to adopt [item 121-1] is granted to the extent described above.

Defendant Carrera-Nevarez's motion to quash arrest and suppress statements [items 53-1, 53-2] was previously withdrawn and is therefore terminated.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:   December 31, 2002